DECISION
{¶ 1} Relator, Pamela Cummings, has filed this original action requesting that this court issue a writ of mandamus ordering respondent, Industrial Commission of Ohio ("commission"), to vacate its order denying her permanent total disability ("PTD") compensation, and to find that she is entitled to such compensation.
 {¶ 2} This matter was referred to a court-appointed magistrate pursuant to Civ.R. 53(C) and Loc.R. 12(M) of the Tenth District Court of Appeals. The magistrate issued a decision, including findings of fact and conclusions of law, and recommended that this court deny relator's request for a writ of mandamus. (Attached as Appendix A.) Relator has filed objections to the magistrate's decision.
 {¶ 3} Relator contends the magistrate erred in refusing to consider her argument that the commission's order violated Stateex rel. Noll v. Indus. Comm. (1991), 57 Ohio St.3d 203. Before the magistrate, relator contended that the commission abused its discretion in finding that she was able to perform the jobs of childcare worker, daycare supervisor, companion, and inventory worker because the Dictionary of Occupational Titles ("DOT") shows that these positions are not compatible with the commission's determination that she is limited to sedentary employment. The magistrate found relator was precluded from raising this issue in mandamus because she failed to administratively challenge, either through her own vocational expert or copies of the DOT, Dr. Howard Caston's report, in which he listed these and other jobs as being within her physical abilities. In her objections, relator asserts she did, in fact, raise the issue before the commission, but, regardless, the true issue is what the commission stated, not what Dr. Caston stated. Relator states that she does not need the DOT to prove that these positions are not sedentary.
 {¶ 4} Relator's arguments are unavailing. Though she does cite to a portion of the hearing transcript that shows she generally raised this issue before the commission, she still cannot escape that she has no admissible evidence to demonstrate upon mandamus that the four positions cited by the commission do not fall within the sedentary range. She states in her objections that the jobs cited by the commission are "clearly" not sedentary in nature, but such statement is insufficient. Further, the issue relator raises does not seem to fall within the holding of Noll.Noll requires the commission to specifically state which evidence it relied upon to reach their conclusion and a brief explanation stating why the employee is or is not entitled to benefits. Here, we conclude the commission did so.
 {¶ 5} After an examination of the magistrate's decision, an independent review of the evidence pursuant to Civ.R. 53, and due consideration of relator's objections, we overrule the objections and find that the magistrate sufficiently discussed and determined the issues raised. Accordingly, we adopt the magistrate's decision as our own, including the findings of fact and conclusions of law contained in it, and deny relator's request for a writ of mandamus.
Objections overruled; writ of mandamus denied.
Klatt, P.J., and McGrath, J., concur.
 APPENDIX A IN THE COURT OF APPEALS OF OHIO TENTH APPELLATE DISTRICT
State of Ohio ex rel. Pamela Cummings, : Relator, : v. : No. 05AP-553 Industrial Commission of Ohio and : (REGULAR CALENDAR) Advics Manufacturing of Ohio, Inc., : Respondents. :
 MAGISTRATE'S DECISION Rendered on December 22, 2005 Robert A. Muehleisen, for relator.
Jim Petro, Attorney General, and Stephanie L. Van Meter,
for respondent Industrial Commission of Ohio.
Dunlevey, Mahan Furry, and William H. Barney, III, for respondent Advics Manufacturing of Ohio, Inc.
 IN MANDAMUS {¶ 6} In this original action, relator, Pamela Cummings, requests a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order denying her permanent total disability ("PTD") compensation and to enter an order granting said compensation.
Findings of Fact:
 {¶ 7} 1. On November 5, 1997, relator sustained an industrial injury while employed as an assembly line worker for respondent Advics Manufacturing of Ohio, Inc. ("employer"), a state-fund employer. The industrial claim is assigned claim number 97-574260 and is allowed for:
Bilateral sprain of hand nos; bilateral dermatitis nos; bilateral enthesopathy of wrist; bilateral carpal tunnel syndrome; left lateral epicondylitis; complex regional pain syndrome; left upper limb reflex sympathetic dystrophy; depressive disorder.
 {¶ 8} 2. On March 2, 2004, relator filed an application for PTD compensation. In support, relator submitted a report dated December 30, 2002, from Elizabeth A. Doriott, D.O., who stated: "It is very reasonable to expect that she is 100% disabled from working in the future."
 {¶ 9} 3. The PTD application form asks the applicant to provide information regarding the applicant's daily activities. In response, relator wrote:
I cannot drive very far because it is difficult to turn my head. I cannot make the bed or do washing anymore. I cannot lift more than 5 lbs. with my arms.
* * *
I dust if I had a good night. Some housecleaning for 45 minutes or so.
 {¶ 10} 4. The PTD application form also asks the applicant to report information regarding work history. On the form, relator reported that she worked on an assembly line for a brake manufacturer from October 1997 to March 1998. She also indicated that she worked as a manager at an Arby's Restaurant from 1991 to 1997. She wrote: "Supervised up to six (6) employees, cleaned out fryer, kept track of drawers when shifts changed."
 {¶ 11} 5. On May 6, 2004, at the employer's request, relator was examined by psychiatrist Michael E. Miller, M.D. Dr. Miller wrote:
Pamela Cummings is a 44-year-old woman who has experienced depression for a number of years. Medications appear to help sleep, irritability, ruminations, and moods. She currently receives psychotherapy to help deal with a number of issues.
I have been asked whether or not Ms. Cummings is permanently and totally disabled from all sustained remunerative employment as a result of a depressive disorder. I have concluded that she is not permanently and totally disabled due to depression. Though her depressive disorder is not in full remission, symptomatology tends to be chronic and mild. Ms. Cummings is capable of remembering work procedures, understanding instructions, carrying out sequential tasks, maintaining attention and concentration, and interacting appropriately with others. She is not judged to be incapable of performing activities of daily living. She is not judged to have significant impairments relative to intelligence, thinking, perception, judgement, affect or behavior, and needs only minor help relative to activities of daily living. Her rehabilitation potential would be described as good.
 {¶ 12} 6. On May 7, 2004, at the employer's request, relator was examined by David C. Randolph, M.D. In his report dated May 17, 2004, Dr. Randolph states:
It is my opinion that if motivated, this claimant could certainly return to work activities in at least a sedentary if not light physical demand characteristic level. It is my opinion it would be unlikely she could return to the full level of light work activities, but is certainly capable of participating in tasks and activities consistent with employment.
* * *
The totality of the presentation contained herein would indicate that Ms[.] Cummings is perfectly capable of work activities if she were so motivated. It is my opinion she is not permanently and totally disabled, but is, in fact, perfectly capable of returning to work activities in at least a sedentary and a limited level of light work activities[.]
 {¶ 13} 7. At the employer's request, Sur-Tech Investigations, Inc. ("Sur-Tech") conducted videotaped surveillance on May 28, 29, 30 and 31, 2004. Sur-Tech issued a report dated June 1, 2004. Regarding the May 28, 2004 surveillance, the Sur-Tech report states:
12:12 P.M.
A male exited the garage and entered the Ford Mustang. He backed out of the driveway and parked on the street in front of the residence.
12:13 P.M.
Ms. Cummings exited the garage carrying a car seat in her right hand. She opened the back door of the Chevy Blazer with her left hand. She then lifted the car seat using both hands and placed it in the back seat of the vehicle.
12:15 P.M.
She bent over to adjust the car seat. She then bent over to pick up a child using both arms. She placed the child in the car seat. She leaned into the vehicle to strap the child into the seat.
12:16 P.M.
She closed the door. She walked to the passenger side of the vehicle. She entered the vehicle and they drove away.
12:19 P.M.
They arrived at Ellis in Waynesville. Ms. Cummings picked the child up and handed her to the male. She closed the car door.
12:20 P.M.
They walked into the store.
01:33 P.M.
They exited the store. Ms. Cummings placed a bag in the vehicle. She picked up the child and placed her in the car seat.
01:34 P.M.
She shut the car door. She walked to the back of the vehicle and placed her hand on the rear hatch to help the male close the hatch. She entered the vehicle on the passenger side. They drove away.
Regarding the May 29, 2004 surveillance, the Sur-Tech report states:
01:06 P.M.
She walked into the garage and moments later she exited carrying a canister vacuum. She carried the canister in her right hand and the hose in her left hand. She bent at the waist and leaned into the car as she began to vacuum. * * *
01:07 P.M.
She started to vacuum the inside of the car. She bent over and twisted to reach into the vehicle. She leaned into the vehicle with her left hand while she vacuumed with her right hand.
01:09 P.M.
She opened the trunk and began to vacuum in the trunk.
01:13 P.M.
She walked into the garage briefly.
01:14 P.M.
She walked back to the trunk and continued to vacuum.
01:16 P.M.
She carried the vacuum back to the side of the vehicle with her right hand. She crawled into the car on her knees and vacuumed inside the vehicle.
01:17 P.M.
She walked to the passenger side of the vehicle and continued vacuuming.
01:19 P.M.
She walked into the garage.
01:20 P.M.
She returned to the vehicle and picked up the vacuum in her left hand. She carried the hose in her right hand as she carried the vacuum into the garage.
01:21 P.M.
She exited the garage carrying a rag in her right hand. She bent into the car and appeared to be cleaning the interior.
* * *
04:32 P.M.
She wiped a chair using a rag in her right hand. She then took a spray bottle in her right hand and sprayed a cleaning solution on the chair. She wiped the chair with a rag in her right hand.
04:33 P.M.
She carried the spray bottle in her left hand and then placed it in her right hand. She opened the door with her left hand.
04:35 P.M.
She continued to clean the chair with her right hand while holding the back of the cushion with her left hand.
04:36 P.M.
She walked to the house and opened the door with her right hand. She walked back to the chair holding a ribbon. She began to sew the cushion using her right hand. She pulled the thread with her right hand.
Regarding the May 31, 2004 surveillance, the Sur-Tech report states:
11:32 A.M.
Ms. Cummings walked from the back of the residence carrying a hanging plant in her right hand. She set the plant in the front yard. She had a phone in her left hand. She took a hanging plant down from a tree in the front yard using both hands. She carried the plant in her right hand to the back yard.
11:34 A.M.
She used both hands to remove a plant holder from the ground in the front yard. She carried it to another place in the front yard. She used both hands to drive it into the ground.
11:35 A.M.
She picked up the hanging plant and placed in on the plant holder.
11:37 A.M.
She was observed carrying a hanging plant in her right hand. She removed wind chimes from a tree using her left hand. She used both hands to hang the plant on the tree. She carried the wind chimes in her right hand as she walked to the back of the residence.
11:38 A.M.
She walked to the front of the house and adjusted the plant hanging on the plant holder with her right hand.
 {¶ 14} 8. On June 8, 2004, at the commission's request, relator was examined by James T. Lutz, M.D. Dr. Lutz found that relator has a "58% whole person impairment." On a Physical Strength Rating form, Dr. Lutz indicated by checkmark "[t]his injured worker is not capable of physical work activity." (Emphasis omitted.)
 {¶ 15} 9. On June 8, 2004, at the commission's request, relator was examined by psychiatrist Donald L. Brown, M.D. Dr. Brown wrote:
* * * I believe that her depressive disorder is in fairly good remission and I do not feel it would prevent her from returning to her former position of employment or other forms of sustained, remunerative employment. That would depend upon her physical status. I believe it would cause her mild impairment and [sic] activities of daily living, socialization and concentration, persistence and pace with moderate impairment in adaptation.
* * *
In my opinion, Ms. Cummings has reached maximum medical improvement with respect to her previously allowed depressive disorder and it can be considered permanent. Utilizing the Fourth Edition of the AMA Guides to the Determination of Permanent Impairment, I'd rate her as having a Class III level of impairment. This is a moderate level of impairment. Referencing the percentages from the Second Edition in the Fourth Edition, I'd rate her impairment at 25-30%.
 {¶ 16} 10. At the employer's request, vocational expert Howard L. Caston, Ph.D., prepared a report dated August 15, 2004. Dr. Caston reviewed the medical reports from Drs. Miller, Randolph, Lutz and Brown. He reviewed the PTD application as well as the Sur-Tech report and video. Dr. Caston's report states:
Ms. Cummings has attained a high degree of skills [sic] related to production work that includes ability to perform production work and assembly work. She also has skills from having been a supervisor in the fast food industry.
Since she has worked in assembly jobs, she has the ability to perform assembly work within her restrictions.
Since she has supervised others and worked in the fast food industry she has acquired skills related to supervising in that and other industries. She has the ability to interview job applicants, train, schedule work, order supplies, take inventory, wait on customers, operate a cash register, and close out a cash drawer at the end of the work day or shift. These skills are transferable to other jobs including but not limited to: fast food supervisor, order clerk, inventory worker, cashier, sales clerk, bookkeeper, and others.
Ms. Cummings also has demonstrated the physical ability to perform other jobs not closely related to her prior employment including auto detailing, child care worker and plant/flower store worker.
* * *
Recent video indicates that there is a full range of motion and the ability to lift, carry, drive, and perform physical activities. These activities clearly exceed the sedentary level of work activity.
* * *
Recent medical information indicates that she is capable of performing work activities within the sedentary range of physical demands.
Her work history has given her skills that are transferable to other occupations. Specific jobs she is able to perform include but are not limited to: light factory assembly, restaurant manager, restaurant cashier, child care worker, auto detailer/car wash attendant, car wash manager, day care supervisor, companion, plant store cashier, gardener/landscaper, kitchen utility worker, seamstress, fast food supervisor, order clerk, inventory worker, cashier, sales clerk, bookkeeper, telephone order clerk, and others.
* * *
Therefore this individual is fully capable of engaging in employment and the impairments related to the allowed claim do not remove her from employment.
 {¶ 17} 11. At relator's request, vocational expert Penny Carr, M.Ed., evaluated relator on December 17, 2004. The Carr report indicates that Dr. Caston's report was among the documents that Ms. Carr reviewed. However, the Carr report does not criticize Dr. Caston's report nor does it address any alleged errors in his report. Ms. Carr reported:
The Wide Range Achievement Test measures reading, spelling, and arithmetic skills. Scores are provided for each of these sub-test areas which can be used to compare the achievement level of one person to another in terms of grade level:
Mrs. Cummings' performance on the WRAT indicates the following:
Reading — 5th grade level. (word recognition only)
Spelling — 4th grade level.
Arithmetic — 2nd grade level.
* * *
Mrs. Cummings faces overwhelming barriers to employment including: bilateral upper extremity resulting in the inability to do lifting, carrying or repetitive handling/fingering; history of failed treatment; a 58% whole person disability rating by the Industrial Commission Medical Examiner; cooperation with medical and rehabilitation recommendations without success; chronic major depression with continued need for bimonthly treatment sessions and medication; work of only physically strenuous, unskilled or marginally semiskilled labor; borderline academic literacy and prolonged absence from the labor force. This combination of limitations renders Mrs. Pamela Cummings permanently and totally occupationally disabled.
(Emphasis sic.)
 {¶ 18} 12. On April 21, 2005, relator's PTD application was heard by a staff hearing officer ("SHO"). The hearing was recorded and transcribed for the record. At the hearing, employer's counsel played portions of the Sur-Tech video and commented with no objection from relator's counsel as to the portions of the video selected or the comments made. During the hearing, relator was asked by employer's counsel to estimate the weight of the child she had placed in the car seat on May 28, 2005, during the surveillance. Relator responded: "I'm guessing maybe 20 pounds." According to relator, the child would have turned three years old in September 2004. Thus, the child was approximately two years and seven months old on the date of the surveillance.
 {¶ 19} 13. Following the hearing, the SHO issued an order denying relator's PTD application. The SHO order states:
The injured worker was examined at the request of the employer by Dr. Randolph with respect to the allowed conditions in the claim. Dr. Randolph opined that the injured worker is capable of returning to gainful employment at a sedentary level. Dr. Randolph further opined that the injured worker is not permanently and totally disabled considering the allowed physical conditions.
The injured worker was evaluated by Dr. Miller at the request of the employer with respect to the allowed psychological condition in this claim. Dr. Miller opined that the allowed psychological condition would not prevent the injured worker from performing gainful employment. He further opined that the injured worker is capable of remembering work procedures, understanding instructions, carrying out sequential tasks, maintaining attention and concentration, and interacting appropriately with others. Dr. Miller further opined that the injured worker does not have significant impairments relative to intelligence, thinking, perception, judgment, affect or behavior, and needs only minor help relative to performing activities of daily living. Dr. Miller further opined that the injured worker's rehabilitation potential would be "good."
The employer presented videotaped evidence from surveillance of the injured worker which took place over a period of 4 days beginning 05/28/2004. The videotaped evidence demonstrates the injured worker's ability to use her hands and arms for lifting, carrying, and fine motor skills. Specifically, the injured worker was observed lifting a 20 pound child in and out of a car seat, carrying and hanging baskets of plants, vacuuming an automobile, cleaning yard furniture, sewing a yard chair cushion and holding onto a telephone while engaging in phone conversation.
The Staff Hearing Officer finds that the injured worker is capable of performing sedentary employment based on the medical opinion of Dr. Randolph and after having viewed the videotaped evidence submitted by the employer. The Staff Hearing Officer further finds that the allowed psychological condition would not prevent the injured worker from performing any form of gainful employment that she is otherwise qualified to perform.
The employer submitted the vocational report of Dr. Caston for consideration. Dr. Caston opined that the injured worker acquired transferable work skills as a result of her past work experience which would enable her to become reemployed. Specifically, Dr. Caston opined that the injured worker acquired skills in production work and assembly work which would enable her to perform sedentary assembly work. He further opined that the injured worker gained supervisory skills as a result of her work experience as a fast food industry manager. Dr. Caston opined that the injured worker would be capable of performing the following specific occupations: light factory assembler, restaurant manager, restaurant cashier, child care worker, auto detailer, car wash attendant, car wash manager, day care supervisor, companion, plant store cashier, gardener/landscaper, kitchen utility work, seamstress, fast food supervisor, order clerk, inventory worker, cashier, sales clerk, bookkeeper, and telephone order clerk.
The Staff Hearing Officer finds that the injured worker is 44 years old, has a 9th grade formal education with the subsequent attainment of a GED, and work experience as an assembler, factory laborer, cook and shift supervisor. The Staff Hearing Officer finds that the injured worker's age is an asset which would enable her to adapt to new work rules, processes, methods, procedures and tools involved in a new occupation. The Staff Hearing Officer further finds that the injured worker's education may not accurately reflect her academic functioning. The injured worker submitted the vocational report of Ms. Carr for consideration. Ms. Carr performed academic testing on the injured worker and reported that she reads at a 5th grade equivalent, spells at a 4th grade equivalent, and performs mathematics at a 2nd grade equivalent. The Staff Hearing Officer finds that the injured worker's academic abilities would preclude her from performing clerical and computational job duties in employment. The Staff Hearing Officer further finds that the injured worker would best learn new skills through on-the-job training. The Staff Hearing Officer finds that the injured worker's work history is consistent with the finding that she would best learn new skills through on-the-job training. Considering the injured worker's age, academic functioning and work experience in conjunction with her ability to perform sedentary employment, the Staff Hearing Officer finds that the injured worker would be capable of performing the following occupations identified in the vocational report of Dr. Caston, such as: child care worker, day care supervisor, companion, and inventory worker. Accordingly, the injured worker's application for Permanent and Total Disability Compensation is denied.
This order is based on the medical reports of Dr. David Randolph dated 05/17/2004, Dr. Michael Miller dated 05/06/2004, The vocational report of Dr. Howard Caston dated 08/15/2004 and the videotaped evidence contained in the claim file.
 {¶ 20} 14. On May 31, 2005, relator, Pamela Cummings, filed this mandamus action.
Conclusions of Law:
 {¶ 21} Relator presents two issues: (1) whether the commission abused its discretion by relying upon the Sur-Tech video surveillance; and (2) whether the commission abused its discretion in finding that relator is able to perform certain jobs described as "child care worker, day care supervisor, companion, and inventory worker."
 {¶ 22} Finding no abuse of discretion, it is the magistrate's decision that this court deny relator's request for a writ of mandamus, as more fully explained below.
 {¶ 23} Turning to the first issue, the magistrate notes that relator does not claim that the Sur-Tech report fails in any way to adequately describe the videotaped evidence.
 {¶ 24} Analysis begins with the observation that the commission, through its SHO, relied upon the videotape to corroborate the reliability of Dr. Randolph's opinion that the industrial injury permits sedentary employment. In this regard, the SHO order states:
The employer presented videotaped evidence from surveillance of the injured worker which took place over a period of 4 days beginning 05/28/2004. The videotaped evidence demonstrates the injured worker's ability to use her hands and arms for lifting, carrying, and fine motor skills. Specifically, the injured worker was observed lifting a 20 pound child in and out of a car seat, carrying and hanging baskets of plants, vacuuming an automobile, cleaning yard furniture, sewing a yard chair cushion and holding onto a telephone while engaging in phone conversation.
The Staff Hearing Officer finds that the injured worker is capable of performing sedentary employment based on the medical opinion of Dr. Randolph and after having viewed the videotaped evidence submitted by the employer. * * *
 {¶ 25} Here, relator incorrectly suggests that the commission relied upon the videotape as evidence that, by itself, would support a finding that the industrial injury permits sedentary employment. Relator argues:
Mrs. Cummings takes issue with the Commission's reliance on the surveillance tape obtained by Advics as evidence that she is able to engage in sustained remunerative employment. The tape shows nothing more than Mrs. Cummings engaged in activities of daily living. * * *
(Relator's brief, at 8.)
 {¶ 26} Relator does not directly challenge Dr. Randolph's report. Relator does not argue that Dr. Randolph's opinion that she can perform sedentary work cannot, by itself, constitute some evidence upon which the commission can rely to determine relator's residual functional capacity. See Ohio Adm. Code4121-3-34(B)(4).
 {¶ 27} It was the duty of the commission to weigh the medical evidence before it to determine the threshold medical issue on residual functional capacity. Here, the commission chose to rely upon Dr. Randolph's report and, in addition, explain how the videotape assisted it in its decision to rely upon his report.
 {¶ 28} Ohio Adm. Code 4121-3-34(B)(2)(a) states:
"Sedentary work" means exerting up to ten pounds of force occasionally (occasionally: activity or condition exists up to one-third of the time) and/or a negligible amount of force frequently (frequently: activity or condition exists from one-third to two-thirds of the time) to lift, carry, push, pull, or otherwise move objects. Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time. Jobs are sedentary if walking and standing are required only occasionally and all other sedentary criteria are met.
 {¶ 29} Relator's admission that the child she lifted into the car seat weighed about 20 pounds could be viewed by the commission as a factor corroborating Dr. Randolph's opinion that she is capable of sedentary employment. Moreover, the video evidence showing relator carrying and hanging baskets, vacuuming an automobile, cleaning yard furniture, and sewing a yard chair cushion can be viewed as corroborative of Dr. Randolph's opinion. Clearly, the commission did not abuse its discretion by relying upon the videotaped evidence.
 {¶ 30} Turning to the second issue, relator asserts here that a review of the Dictionary of Occupational Titles ("DOT") will show that the positions of child care worker, day care supervisor and companion have a light work strength requirement. Relator also asserts that the position of inventory worker has a medium work strength requirement and that the position is noted to be clerical, an employment that the SHO found that relator cannot do. Relator refers this court to several code numbers that she asserts are contained in the DOT. Relator argues that the positions are not compatible with the commission's determination that relator is limited to sedentary employment. Relator is precluded from raising this issue here.
 {¶ 31} Relator failed to administratively challenge Dr. Caston's report, which states:
Recent medical information indicates that she is capable of performing work activities within the sedentary range of physical demands.
Her work history has given her skills that are transferable to other occupations. Specific jobs she is able to perform include but are not limited to: light factory assembly, restaurant manager, restaurant cashier, child care worker, auto detailer/car wash attendant, car wash manager, day care supervisor, companion, plant store cashier, gardener/landscaper, kitchen utility worker, seamstress, fast food supervisor, order clerk, inventory worker, cashier, sales clerk, bookkeeper, telephone order clerk, and others.
 {¶ 32} Dr. Caston's report can be interpreted as indicating that at least some of the employment options listed can fall within the sedentary range of physical demands.
 {¶ 33} Relator could have requested that her vocational expert, Penny Carr, challenge Dr. Caston's employment options as not being sedentary, but the Carr report fails to address Dr. Caston's report notwithstanding that Carr prepared her report some four months after Dr. Caston's report was issued. Also, at the April 21, 2004 hearing before the SHO, relator's counsel could have challenged Dr. Caston's report by submitting portions of the DOT that counsel believes discredit Dr. Caston's employment options. However, the hearing transcript discloses that relator's counsel failed to do so.
 {¶ 34} Now, in this action, relator inappropriately invites this court to, in effect, second-guess Dr. Caston's report using a source outside the record. Issues not raised administratively are ordinarily not reviewable in mandamus. State ex rel. QuartoMining Co. v. Foreman (1997), 79 Ohio St.3d 78; State ex rel.Manning v. MVM, Inc., Franklin App. No. 03AP-1287,2005-Ohio-290. Thus, relator is precluded from raising the issue here.
 {¶ 35} Accordingly, for all the above reasons, it is the magistrate's decision that this court deny relator's request for a writ of mandamus.
 /s/ Kenneth W. Macke
KENNETH W. MACKE MAGISTRATE